UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PHYLLIS MARTINDALE,

      Plaintiff,                                   Case No. 10-15173

vs.                                        HON. AVERN COHN

LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

      Defendant.
_____/

## MEMORANDUM AND ORDER
## DENYING PLAINTIFF'S MOTION TO REVERSE ADMINISTRATIVE DECISION
## (Doc. 15)
## AND
## DIRECTING THE ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT[1]

### I. Introduction

This is a benefits case under the Employment Retirement Income Security Act,

29 U.S.C. § 1001, et seq (ERISA).  Plaintiff Phyllis Martindale (Martindale) is suing

defendant Lincoln National Life Insurance Company (Lincoln National).  Martindale

claims that Lincoln National wrongfully denied her claim for long term disability benefits

under a plan sponsored by her employer, Macomb Residential  Opportunities, issued

and administered by Lincoln National.  The matter is before the Court on Martindale's

motion to reverse Lincoln National's decision as arbitrary and capricious.  For the

reasons that follow, Martindale's motion will be denied and a judgment will enter in favor

of Lincoln National.

_____

[1]This motion was originally scheduled for hearing. However, upon review of the
parties' papers, however, the Court finds the matter appropriate for decision without oral
argument.  See Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

## II.  Legal Standard  -  Motion for Entry of Judgment

In Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609 (6th Cir.1998), the

Court of Appeals for the Sixth Circuit held that summary judgment procedures may no

longer be used in the Sixth Circuit in denial of benefits actions under ERISA.  In Wilkins,

the court of appeals decided a district court should adjudicate an ERISA action as if it

were conducting a standard bench trial and, therefore, determining whether there is a

genuine issue of fact for trial would make little sense.  150 F.3d at 618-19 (Gilman, J.,

concurring in part and setting out the judgment of the court of appeals on the issue

regarding the summary judgment standard).

Accordingly, the Court will decide this matter under the guidelines set forth in

Wilkins[2] by rendering findings of fact and conclusions of law based solely upon the

---

[2]  The court of appeals' "Suggested Guidelines" are as follows:
1. As to the merits of the action, the district court should conduct a de
novo review based solely upon the administrative record, and render
findings of fact and conclusions of law accordingly.  The district court may
consider the parties' arguments concerning the proper analysis of the
evidentiary materials contained in the administrative record, but may not
admit or consider any evidence not presented to the administrator.
2. The district court may consider evidence outside of the administrative
record only if that evidence is offered in support of a procedural challenge
to the administrator's decision, such as an alleged lack of due process
afforded by the administrator or alleged bias on its part.  This also means
that any prehearing discovery at the district court level should be limited to
such procedural challenges.
3. . . . the summary judgment procedures set forth in Rule 56 are
inapposite to ERISA actions and thus should not be utilized in their
disposition.
150 F.3d at 619.

administrative record.[3]  See Eriksen v. Metropolitan Life Ins. Co., 39 F. Supp. 2d 864

(E.D. Mich. 1999).

### III.  Standard of Review

The parties agree that the standard of review in this case is whether the denial of

benefits was arbitrary and capricious because Lincoln had discretionary authority to

construe and interpret the plan.[4]  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S.

101, 115 (1989); Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991).

This standard is the "least demanding form of judicial review."  Administrative

Committee of the Sea Ray Employees Stock Ownership and Profit Sharing Plan v.

Robinson, 164 F.3d 981, 989 (6th Cir. 1999).  This requires "review of the quality and

quantity of the medical evidence and the opinions on both sides of the issues."

McDonald v. W.-S. Life Ins. Co., 347 F.3d 161, 172 (6th Cir.2003).  The plan

---

[3]The administrative record was filed with the Court.  Docs. 14-1 to 14-10.
Citations to the administrative record will be "LN," followed by the corresponding bates
numbered page.  For example, page 75 of the administrative record will be cited as LN
75.

[4]The Plan provision entitled "COMPANY DISCRETIONARY AUTHORITY" states:
Except for the functions that this Policy clearly reserves to the Policyholder or
Employer, the Company has the authority to manage this Policy, interpret its
provisions, administer claims and resolve questions arising under it. The
Company's authority includes (but is not limited to)
the right to:
1. establish administrative procedures, determine eligibility and resolve
claims questions;
2. determine what information the Company reasonably requires to make
such decisions; and
3. resolve all matters when an internal claim review is requested.
Any decision the Company makes in the exercise of its authority shall be conclusive and
binding; subject to the Insured Employee's rights to request a state insurance
department review or to bring legal action.  (LN 75).

3

administrator's decision should be upheld if it is "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006), aff'd, Met. Life Ins. Co. v. Glenn, --- U.S. ----, 128 S.Ct. 2343 (2008). The standard, although deferential, is not "inconsequential." Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005). "While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." Id.

Moreover, the Sixth Circuit has made clear that a court is to consider several factors in reviewing a plan administrator's decision, including the existence of a conflict of interest, the plan administrator's consideration of a Social Security Administration determination, and the quality and quantity of medical evidence and opinions. Glenn, 461 F.3d at 666.[5]

### IV.  Findings of Fact

The following facts are gleaned from the administrative record.

### A.  Relevant Plan Provisions

The plan defines disability as follows:

TOTAL DISABILITY or TOTALLY will be defined as follows:

1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.

2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main

---

[5]Martindale has not argued that Lincoln National was operating under a conflict of interest. Even if it were, it would only be a factor in determining whether Lincoln National's decision was arbitrary and capricious. See Glenn, 128 S.Ct. at 2348-50.

Duties of any occupation which his or her training, education or
experience will reasonably allow.

(LN 70).  The plan also provides that "OWN OCCUPATION PERIOD means a period

beginning at the end of the Elimination Period and ending 24 months later for Insured

Employees."  (LN 64).  Finally, the plan provides that "Other Income Benefits" are offset

in determining the amount of the Insured Employee's Monthly Benefit.  (LN 85).  Other

Income Benefits includes benefits received under Social Security.  (LN 85).  The plan

directs that "An Insured Employee who may be entitled to some Other Income Benefit is

required to actively pursue it." (LN 87).

### B.  Lincoln National's Administrative Review of Martindale's Claim

#### 1.  Background

Martindale was employed as a Medical Health Technician with Macomb Regional

Opportunities.  Her position required her to assist others in activities of daily living,

including personal hygiene and grooming.  Her occupation was considered medium

strength level work that required her to lift people, move wheelchairs, assist in

transferring individuals, occasionally list 20-50 pounds, frequently lift 10-25 pounds,

constantly lift up to 10 pounds, and occasionally stoop, kneel, and crouch.

On June 22, 2005, Martindale had gastric bypass surgery.  She also has a

history of recurring hernias.  (LN 949).  On July 28, 2006, Martindale's hernia was

surgically repaired by general surgeon, Gary Katz, D.O.  (LN 936).

#### 2.  Initial Approval of Benefits

On November 1, 2006, Lincoln National received Martindale's claim for long

term disability (LTD) benefits.  (LN 784).  Martindale's last day of work was noted as

5

July 31, 2006.  As part of her claim, she submitted a Physician's Statement from Dr.

Katz, who listed Martindale's diagnosis as "morbid obesity" and "incisional hernia."  (LN

781; LN 779).  Martindale listed her treating physicians as family practitioner, Stanley

Remer, D.O., and general surgeons, Dr. Katz and David M. Siegel, D.O. (LN 786).

By letter dated November 7, 2006, Lincoln National notified Martindale that her

claim for LTD benefits was approved.  (LN 721).  The letter further stated:

> Our experience with disability claims has shown that many people are able
> to resume work activities within a short amount of time after becoming
> disabled. We will continue to closely monitor your medical condition
> with periodic updates so when it appears you may be able to return to
> work, you will be aware of the return-to-work provisions in your policy.
> Please contact us when you do return to work or for more information on
> how we can help you with your return to work plans.

(LN 723).  The letter also advised Martindale that the plan's definition of Total Disability

changes from an "Own Occupation" standard to an "Any Occupation" standard after 24

months.  After quoting the definition of Total Disability, Lincoln National stated:

> The Own Occupation period refers to the maximum time we will pay you
> for being unable to perform the main duties of your occupation. The Own
> Occupation period for this policy is 24 months.
> Benefits could be payable for 24 months for your claim if you remain
> eligible throughout the Own Occupation period. However, after the Own
> Occupation period your claim would be re-evaluated to determine if you
> meet the definition of disability for any occupation.

(LN 722).

Martindale had additional abdominal surgery on October 11, 2006, January 29,

2007, and August 22, 2007. (LN 301).  Lincoln National continued to pay LTD benefits

while she recovered from surgery.

### 3.  Termination of Benefits and Subsequent Reinstatement

On September 27, 2007, Lincoln National informed Martindale in writing that:

6

> We are paying your claim to 10/11/2007 and closing it.  The maximum
> estimated time of recovery for your condition is 8 weeks.  We are paying
> you through these 8 weeks plus 1 additional week for a Transitional
> Benefit.  If you are unable to return to work on 10/11/2007 for medical reasons
> and you want to be considered for benefits beyond that date, you are required
> to have your attending physician provide medical evidence of what
> complication(s) have occurred and the severity of these complications.
> This medical evidence should include office and treatment notes and
> copies of any testing results available.  A note from your physician,
> without any supporting documentation, may not be sufficient to consider
> further benefits.

(LN 634).

On October 15, 2007, Lincoln National received a handwritten note from

Martindale which stated, "appeal this decision" and "My doctor will be sending info on

my health."  (LN 630).  Martindale included a prescription pad note from Dr. Remer,

dated October 15, 2007, which stated:  "The above patient continues to be unable to

work at this time due to severe shakiness, weakness & syncopal episodes. She

continues to undergo testing at this time."  (LN 628).

Martindale had additional abdominal surgery on January 20, 2009, by Dr.

Siegel.  (LN 418; LN 302)

Lincoln National obtained Martindale's medical records, which included the

January 20, 2009 surgery, and consulted with Dr. Harold E. Gottlieb, a physician Board

certified in internal medicine. (LN 301-LN 306). Dr. Gottlieb's December 16, 2009 report

states:

> After reviewing the medical information as of 10/11/2007 forward
> significant findings include:
> The claimant has significant weakness in her abdominal wall predisposing
> her to ventral hernias. She has had multiple surgeries and infections of the
> mesh used to repair the hernias. She does not have any other significant
> medical issues. She was seen by a neurologist for headaches and back
> pain but a work up did not reveal any significant findings.

RATIONALE:
The only significant medical condition is the recurrent ventral hernias.
The records suggest that her other complaints of headaches, back pain,
fatigue and weakness do not have a physiological basis. The claimant was
seen by Dr. Green, a neurologist on 01/02/2009 for cephalgia. She
described two types of headache. On physical examination, the neurologic
exam was completely normal. Her diagnosis was migraine headache,
muscle contraction cephalgia, and lumbar myofascial pain syndrome.
A MRI of the lumbar spine on 01/12/2009 showed degenerative changes
at multiple levels and a left lateral disc herniation at L3-L4 without neural
foraminal encroachment. A MRI of the brain on the same date was
unremarkable. Based on these findings, there is no evidence of nerve
impingement or serious etiology regarding her headaches.

(LN 303).

Dr. Gottlieb's December 16, 2009 Report further states:

The claimant's impairments as of 10/11/2007 consist of a weak
musculature in the abdominal wall. These impairments would translate
into restrictions and limitations from performing the main duties of a
medium occupation as defined by the Department of Labor. A medium
occupation consists of typically being on your feet for a minimum of six
hours out of an eight hour day and lifting no more than 50 pounds
occasionally. The claimant may stand for six hours out of an eight hour
day but may not do any lifting, carrying, pushing, pulling, bending,
squatting, stooping, or twisting.

RATIONALE:
The claimant has had multiple surgeries to repair ventral hernias. On
01/20/2009 she had an incisional herniorrhaphy with mesh by Dr. Siegel.
Dr. Remer wrote on 08/17/2009 that she has a five inch opening in her
abdomen which has not healed and she could not do any housework. Dr.
Siegel saw the claimant on 11/04/2009. He felt that she was developing a
chronic pain syndrome. Her wound was healing slowly and he felt she
could not do any lifting, bending, stooping or twisting. Since her wound
was healing so slowly, every precaution needs to be taken to allow full
healing and to avoid dehiscence of the surgical site.

(LN 303-LN 304).

Dr. Gottlieb"s December 16, 2009 report further states:

The claimant has had multiple surgeries to repair ventral hernias with the

8

most recent being on 01/20/2009.  This wound has still not fully healed.  It is reasonable and appropriate to restrict lifting, carrying, pushing, pulling, bending, squatting, stooping, and twisting because all of these activities have the potential of causing strain on the abdominal musculature and causing dehiscence of the surgical wound. Restriction of these activities is required to prevent dehiscence of the surgical site and to allow full healing of the hernia repair.

***

The claimant's current work capacity as of 10/23/2008 forward as it applies to Department of Labor guidelines and associated medical restrictions and limitations as of the current date and moving forward are described as follows:

The claimant is unrestricted for sitting, standing, walking, and climbing. She is unrestricted in the ability to use her upper extremities to perform frequent to constant fingering, feeling and/or handling. She is totally restricted for lifting, carrying, pushing, pulling, bending, squatting, stooping, crawling and twisting. She is totally restricted to reaching below her waist or above her shoulders. She may reach at waist level.

(LN 304-LN 305).

Based on the medical evidence, including Dr. Gottlieb's report, on January 7, 2010, Lincoln National reinstated payment of LTD benefits to Martindale, including all benefits payable from October 11, 2007 to November 5, 2009.  (LN 280; LN 262).

Per the plan terms, Martindale's "Own Occupation" period ended October 23, 2008, after benefits had been paid for 24 months.  (LN 262).  However, when her LTD benefits were reinstated on January 7, 2010, Lincoln National notified Martindale that her benefits "will temporarily continue beyond the Own Occupation date listed above as [Martindale] has been determined to currently be unable to perform in Any Occupation."  (LN 262).  This was done to allow Martindale to recover from her January 20, 2009 abdominal surgery.

### 4. Continued Review of Martindale's Condition

Lincoln National continued to monitor Martindale's medical condition.  To that

9

end, Lincoln National obtained medical records from Dr. Siegel and Dr. Remer. (LN 5; LN 240; LN 246).  Records obtained from Dr. Siegel on February 10, 2010, noted that Martindale's "wound is healing up slowly"" as of November 4, 2009. (LN 5; LN 248).  Dr. Siegel's December 28, 2009 record stated that Martindale's surgical wound "is almost completely healed."  (LN 247).

On March 25, 2010, Lincoln National contacted Dr. Siegel's office by telephone. Dr. Siegel's office informed Lincoln National that Martindale had not "been seen in their office since 12/28/09" and was not scheduled for any follow up visits.  (LN 4; LN 57).

Lincoln National also obtained records from Martindale's March 2010 visit to Troy Hospital.  The records show that Martindale was evaluated for seizures.  The record from March 2, 2010 states that Martindale "has had seizure disorder since the age of 16 if not longer.  On her own, she stopped the Dilantin 12 years ago." (LN 202). The record further states, "head CT scan was reported as normal.  Her lab work was within normal limits except for hemoblogin of 11.3." (LN 202).  The record further states that the examining physician "stressed the need for her to be on anticonvulsants."  (LN 203). The "§CT HEAD/BRAIN W/O IV CONTRAST" listed the "Impression" as "Normal head CT."  (LN 223).  A physical examination at Troy Hospital on March 1, 2010 notes "Negative for nausea, vomiting, abdominal pain and diarrhea." (LN 208).  A second examination on March 1, 2010 notes, "Abdominal, Soft.  She exhibits no distension and no mass.  No tenderness.  She has no rebound and no guarding." (LN 210).  A physical examination on March 2, 2010 noted  "Abdomen: Not distended, soft. Midline thick hypotrophic scar present."  (LN 205).

Lincoln National then consulted Certified Rehabilitation Counselor (CRC), Debora

10

Frazee, to conduct a vocational analysis.  On December 30, 2009, Ms. Frazee prepared

a Vocational Assessment.  (LN 285-287).  Under the subheading "MEDICAL STATUS,"

the Vocational Assessment states:

> This vocational assessment is based on an external PEER medical review
> completed on 12/16/2009. The review identifies a sedentary to light work
> capacity with the following information:
> "The claimant is unrestricted for sitting, standing, walking and climbing.
> She is unrestricted in the ability to use her upper extremities to perform
> frequent to constant fingering, feeling and/or handling.  She is totally
> restricted for lifting, carrying, pushing, pulling, bending, squatting,
> stooping, crawling and twisting.  She is totally restricted to reaching below
> her waist or above her shoulders.  She may reach at waist level."

(LN 285).

The Vocational Assessment identified Martindale's transferable skills based on

her occupational experience, including:

> The ability to understand instructions and underlying concepts, and to
> reason and make judgments.
> The ability to understand the meaning of words and to use them
> effectively, comprehend language, understand the relationship between
> words and the understanding of words and understand the meaning of
> whole sentences.
> The ability to learn simple processes.
> The ability to perform the same task over and over again.
> The ability to set and meet standards.
> The ability for simple verbal and written communication.
> The ability and knowledge of how to observe and document observations.
> The ability to work effectively as a team member.

(LN 285-LN 286).

The Vocational Assessment states:

> The following are examples of positions that Ms. Martindale has the
> potential to perform based on her education, work history, gainful amount
> and physical capacity. The identified positions are performed at the
> sedentary to light levels and can be expected to exist within approximately
> a 60-mile radius of the claimant¡|s home, and are appropriate from the
> standpoint of adequate salary level to show gainful employment.

11

(LN 286).  The sedentary level occupations identified in the Vocational Assessment include Telemarketer, Surveillance System Monitor, Order Clerk, and Switchboard Operator.  (LN 286).

### 5.  Termination of Benefits

On April 7, 2010, Lincoln National notified Martindale, through counsel, that Lincoln National has "completed our review of your client's Long Term Disability claim and have determined that we must deny benefits beyond 12/28/2009."  (LN 230).  The letter further stated:

> The Own Occupation Period for your client¡|s claim ended on 10/23/2008. After a thorough review of the information currently contained in your client¡|s claim file, we have determined your client is capable of performing work in other occupations as of 12/29/2009. Outlined below is the information reviewed which led to our determination.

(LN 230).  The letter explains the information reviewed, including medical and vocational evidence, and states:

> In summary, it is our determination that based upon your client¡|s age, education, training, past work experience and your client's current abilities, that your client is not prevented from performing work in other occupations, even if she can no longer perform her Own Occupation. Therefore, your client no longer meets the definition of disability in this policy and benefits are being denied as of 12/29/2009.  Your client's payment for benefits through 12/28/2009 was sent under separate cover on 03/22/2010.
> To qualify for ongoing Total Disability benefits, your client must have restrictions and limitations beyond 12/28/2009 that render your client unable to work in any gainful occupation (sedentary or otherwise) that your client¡|s past training, education and experience will reasonably allow. If you believe that your client's condition prevents her from working in any occupation, please submit medical records, not previously submitted, that will help us evaluate your client's capacity to work as of 12/29/2009.

(LN 232).

12

The letter also advised Martindale of her right to request a review and instructed her that her request for an appeal should include "[m]edical records to support your appeal such as office and treatment notes, laboratory results, x-rays and testing results" and that she "may also request copies of the pertinent documents." (LN 232).

### 6. Martindale's First Appeal

On May 17, 2010, Martindale, through counsel, appealed Lincoln National's by letter, stating "Please accept this letter as our appeal of the denial of Ms. Martindale's benefits." (LN 193).

On May 20, 2010, Lincoln National notified Martindale through her counsel:

We acknowledge receipt of your 05/17/10 appeal letter. We received your letter on 05/19/10.

It appears that the most recent medical records (office treatment notes and/or test results) in your client's file are from 03/10. No new or additional medical evidence was submitted with your letter of appeal.

In an effort to provide your client's claim with a full and fair review, it may be in her best interest to submit additional medical records (in addition to what was previously submitted) for our review of your client¡|s appeal. For specific details regarding the basis of our determination and the information previously reviewed, please refer to our letter dated 04/17/10.

It is important that we have all available medical records so that we have a clear picture of your client's current condition.

***

Please note that we are not making a final determination on your client's disability claim at this time, as we want to provide you with every opportunity to submit a complete appeal.

(LN 195).

On June 11, 2010, Martindale submitted a "To Whom It May Concern" letter from Dr. Siegel, dated May 26, 2010, which states Martindale's "wound is still not

healing appropriately.  It has improved but definitely is very slow to granulate in.  She still has a chronic generalized abdominal pain." (LN 185; LN 187).

On July 13, 2010, Lincoln National notified Martindale that her appeal was denied, explaining the information reviewed, including medical and vocational evidence did not warrant benefits beyond December 29, 2009.  The letter also advised Martindale of her appeal rights under the plan.  (LN 151-LN 157).

### 7.  Martindale's Second and Final Appeal

On July 23, 2010, Martindale submitted her second appeal to Lincoln National, stating that the appeal was "based upon the medical records and related medical/vocational information that has been previously supplied." (LN 145).

Lincoln National consulted Dr. Robert Cooper, a physician Board certified in internal medicine, to evaluate Martindale's medical records.  (LN 118-LN 123).  In his August 23, 2010 Report, Dr. Cooper stated:

> The claimant's current work capacity as it applies to Department of Labor Guidelines and any associated medical restrictions and limitations as of current date and moving forward is sedentary. Associated medical restrictions and limitations as of current date and moving forward relating to the ventral hernia include no lifting, carrying, pushing or pulling more than 10 pounds and no bending, squatting or stooping. Additional restrictions and limitations relating to the seizure disorder include no driving or operating heavy machinery or working at heights.
>
> RATIONALE:
>
> Sedentary work capacity as it applies to Department of Labor guidelines includes sitting for six hours out of an eight hour day and lifting no more than 10 pounds occasionally. None of the restrictions or limitations relating to the ventral hernia or seizure disorder prevents the claimant from functioning in a sedentary work capacity.

(LN 121).  Dr. Cooper opined that "Restrictions and limitations preventing the claimant

14

from working in any capacity are not supported.  Weak abdominal muscles would not impose restrictions or limitations preventing all work."  (LN 119).  Dr. Cooper stated that Martindale was receiving "optimal" treatment and that her "prognosis for improvement in functioning is excellent."  (LN 121)

On September 1, 2010, Lincoln National provided Martindale, through counsel, with a copy of Dr. Cooper's report.  (LN 116).  The letter states:

> On 8/2/2010 we acknowledged receipt of the appeal you filed on behalf of Phyllis Martindale and advised that we would begin a review of her file. As part of your client's second level appeal review we had an Independent Medical Peer Review performed on the file.  We are enclosing a copy of the entire report with this letter.
> We would like to provide you with 21 days to review the report with your client and her physician(s). You may want to submit any written comments or documents from yourself and/or her physician(s) in regards to the findings of the review.
> The 21-day period will expire on 9/22/2010. [. . .] If we do not receive a response by 9/22/2010, then we proceed with rendering a decision based on the information currently in the file.

(LN00116).

In a letter dated September 14, 2010, Martindale's counsel questioned the level of the lifting restriction noted by Dr. Cooper, stating:

> It is noted that nowhere in the Response and Rationale to Question #5 is there any indication that the claimant can lift over 10 pounds occasionally (the definition of sedentary work capacity, as defined by the Department of Labor, includes sitting for 6 hours out of an 8-hour day and lifting no more than 10 pounds occasionally).

(LN 111) (emphasis in original).  No additional medical records and no physician comments were submitted with the letter.  (LN 110-LN 112).

Following receipt of Martindale's counsel's letter, Lincoln National consulted with Dr. Cooper, asking whether Martindale "can lift up to 10 lbs or if the claimant is

15

restricted from all lifting as indicated by her physician."  (LN 105).  In his report, dated

October 18, 2010, Dr. Cooper stated that Martindale "could lift up to ten pounds,"

explaining:

> The claimant¡|s treating physician indicates in notes and in his treatment plan the claimant would be restricted from all lifting. This is not consistent with the clinical evidence provided for review. The claimant has abdominal wall weakness predisposing her to multiple ventral hernias, which have required multiple surgeries and resulted in mesh infections. The claimant¡|s impairments from 12/28/2009 to current include an abdominal wall weakness predisposing her to recurrent ventral hernias. A lifting restriction of ten pounds would be appropriate to prevent dehiscence of the surgical site and to allow full healing and prevent future ventral hernias. There is no clinical evidence of instability in the abdominal muscles or wound so as to preclude the claimant from any lifting. While the claimant¡|s abdominal wall weakness and predisposition to recurrent hernias causes functional impairment and supports a lifting restriction of ten pounds, there is no clinical evidence noted to support a restriction of no lifting at all.

(LN 105-LN 106).

On October 28, 2010, Lincoln National informed Martindale, through counsel, of

its determination that no benefits are payable beyond December 29, 2009.  (LN 097-LN

104).  The letter explained the provisions of the plan, the information reviewed, including

medical and vocational evidence, and the basis for the determination, and advised

Martindale that she has exhausted her administrative remedies under the Plan. (LN

97-LN 104).  Lincoln National explained that although Martindale was approved for

benefits by the Social Security Administration,[6] the plan

> provisions and review processes are independent from that of the Social Security Administration (SSA). Although benefits have been approved for SSDI, this decision was based on the SSA's plan provisions and independent information

---

[6]As explained in the following section, Martindale was awarded Social Security benefits.

received by the SSA.  The claim decision made under your client's Lincoln
Financial Group Policy was based upon information we have obtained from you,
your client, her treating medical professionals and the results of any internal
and/or external reviews of her claim by clinical staff.

(LN 103).

### 8.  Martindale's Social Security Application

On June 11, 2007, while she was being provided LTD benefits from Lincoln

National, Martindale requested a hearing on her application for Social Security Benefits.

A hearing was held in March 20, 2009.  In a decision dated July 30, 2009, Martindale

was awarded Social Security disability benefits.  (LN 355-LN 360). The Decision states

in part:

> In December 2008 Stanley Remer D.O., the claimant¡s treating family
> physician, gave the claimant preclusive limitations for full time work.
> This opinion is explained by Dr. Remer¡s reports and consistent with the
> record as a whole. Therefore the undersigned adopts this opinion and
> gives it controlling weight.

(LN 358) (internal exhibit reference omitted).  The decision further states, "Medical

improvement is expected with appropriate treatment.  Consequently, a continuing

disability review is recommended in 24 months."  (LN 360).

### V.  Conclusions of Law

With respect to Lincoln National's decision, from a detailed review of the

administrative record, as set forth above, the Court is satisfied that the decision to

terminate Martindale's LTD benefits was neither arbitrary nor capricious.  The decision

is supported by (1) Martindale's medical records documenting her surgical recovery, (2)

the medical opinions of consulting physicians Dr. Gottlieb and Dr. Cooper that

Martindale has the functional capacity for sedentary work, (3) the absence of medical

17

evidence demonstrating that Martindale lacks the functional capacity for sedentary work, and (4) the Vocational Assessment identifying occupations that Martindale has the functional capacity, education, training, and experience to perform.  The accumulation of this data provides a reasoned basis for Lincoln National's benefit decision.  See Morris v. American Electric Power Long-Term Disability Plan, 399 Fed.Appx. 978, 981 (6th Cir. 2010) ("The ultimate question in any given disability case on 'arbitrary and capricious' review is whether a plan can offer a reasoned explanation, based on the evidence, for its judgment that a claimant was not 'disabled' within the plan's terms.")

In response, Martindale's argument[7] seems to ignore the change in definition of Total Disability from the "own occupation" standard to the stricter "any occupation" standard.  Martindale argues that the 10-pound lifting restriction found by consulting physician Dr. Cooper "read in conjunction with" Martindale's medium strength occupation "conclusively establishes" that Martindale is disabled under the Plan. (Martindale's Brief at p. 10).  However, to satisfy the plan's "any occupation" definition of Total Disability, Martindale must establish that, as of December 28, 2009 when her claim was closed, her medical condition prevented her from performing each of the Main Duties of any occupation, not just her prior medium strength occupation as a health care worker.

Martindale failed to provide any medical or vocational evidence that she lacked

---

[7]As Lincoln National points out, Martindale's argument appears to have been taken from a filing in another case, including a recitation of the medical evidence in the administrative record of that case.  Clearly, the information contained the administrative record in another case has no bearing on Lincoln National's decision in this case.

18

the functional capacity for sedentary work as of December 28, 2009 or that she is
unable to engage in the sedentary occupations identified by the Rehabilitation
Counselor.  Dr. Cooper thoroughly evaluated Martindale's medical records,
acknowledged that she had functional restrictions, but concluded that these restrictions
would not prevent Martindale from performing sedentary level work.  Lincoln National
reasonably relied on the medical opinions of Dr. Cooper in closing Martindale's claim as
of December 28, 2009.  See McCandless v. Standard Ins. Co., 765 F.Supp.2d at 955
("There is nothing inherently objectionable about a file review by a qualified physician in
the context of a benefits determination.") (internal quotations omitted).  Martindale relies
on Dr. Remer's out-dated opinions from October 2007 that Martindale was "unable to
work."  (Martindale's Brief at p. 9).  However, Martindale was paid benefits for more than
two years after Dr. Remer issued his opinion in 2007.  Martindale's medical condition
changed significantly after 2007.  Dr. Remer's opinion that Martindale was unable to
work in her medium occupation as a health care worker in 2007 does not support a
finding that Martindale lacked the functional capacity to perform sedentary work in 2010.
See Maleszewski v. Liberty Life Assur.Co. of Boston, No. 09-13926, 2010 WL 1416995,
at *8 (E.D. Mich. Apr. 8, 2010) (holding that the treating physician's opinion that the
insured was "totally incapacitated" during the "'own occupation' period of disability, when
everyone, including [the administrator], agreed that [the insured] was incapable of
performing the duties of his own line maintenance position," does "not support the view
that [the insured] was incapable of returning to work in a sedentary occupation.").
Moreover, "differences of opinion between plaintiff's treating doctors and the examining
physicians does not render the administrator's decision arbitrary and capricious."

Barnes v. Hartford Life & Acc. Ins. Co., No. 07-12141, 2008 WL 4298466, at *9 (E.D. Mich. Sept. 18, 2008).

Martindale also argues that Lincoln National's decision was arbitrary and capricious is that this Court should adopt the "treating physician rule" explicitly rejected by the Supreme Court in Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003).[8] Nord prohibits any presumption that a treating physician's opinion warrants greater deference than a consulting physician's opinion. As the Sixth Circuit explained, "[u]nder ERISA, plan administrators are not required to accord special deference to the opinions of treating physicians. Moreover, ERISA does not impose a heightened burden of explanation on administrators when they reject a treating physician's opinion. Reliance on other physicians is reasonable so long as the administrator does not totally ignore the treating physician's opinions." Balmert v. Reliance Standard Life Ins. Co., 601 F.3d 497, 504 (6th Cir. 2010) (internal citations omitted) (citing Nord, 538 U.S. at 831). See also Paliczuk v. Unum Life Ins. Co., No. 09-10794, 2009 WL 3270489, at *6 (E.D. Mich. Oct. 1, 2009) ("Although [plaintiff] argues that there is some question as to whether a treating physician who has seen a patient for a long period of time is entitled to ore weight, there is no authority for such an argument. Nord is the controlling standard.").

In any event, Lincoln National did not ignore Dr. Siegel's opinion from August and November of 2009 that Martindale was restricted from all lifting. Lincoln National's consulting physician, Dr. Gottlieb, in his December 16, 2009 Report, considered and

_____

[8]While Martindale contends Nord was wrongly decided, that argument cannot carry the day as it is beyond dispute that the Court is bound by the Supreme Court's decision.

20

agreed with the opinions of Dr. Siegel and Dr. Remer that Martindale was restricted

from lifting while her surgical incision healed.  Indeed, Lincoln National reinstated benefit

payments based on the medical opinions of Drs. Siegel, Remer, and Gottlieb.  However,

subsequent medical evidence, however, demonstrated that Martindale's surgical wound

healed and her condition improved.  Consulting physician Dr. Cooper directly explained

why the post-2009 medical evidence failed to support continued restrictions from all

lifting.  Lincoln National's decision to rely on Dr. Cooper's comprehensive assessment

was not arbitrary or capricious.

     Martindale also argues that Lincoln National's decision must be reversed

because she was awarded Social Security benefits.  As noted above, the plan requires

claimants to pursue Social Security benefits, which are offset against benefits payable

under the plan.  However, the fact that Martindale was awarded benefits is not evidence

of arbitrary and capricious decision making by Lincoln National.  An award of benefits

does "not mean that an individual is automatically entitled to benefits under an ERISA

plan, as the plan's disability criteria may differ from the Social Security Administration's.

Notably, Social Security determinations follow a highly deferential 'treating physician

rule' that does not apply in ERISA cases."  Paliczuk, 2009 WL 3270489, at *6 (internal

citations omitted).  See also, Nord, 538 U.S. at 834.

     Here, the decision awarding benefits was the product of the treating physician

rule.  The Administrative Law Judge (ALJ) specifically adopted the December 2008

opinion of Martindale's family physician, Dr. Remer, that she was precluded from

full-time work, stating "the undersigned adopts this opinion and gives it controlling

weight."  (LN 358).  Even the ALJ noted that Martindale's condition would likely improve

21

over time.  (See LN 360).  Significantly, at the time of the decision on July 30, 2009,
when Martindale was still recovering from her January 2009 surgery, Lincoln National
agreed that Martindale qualified for disability benefits and was paying them while she
continued to recover.  However, as the ALJ anticipated, Martindale's condition improved
and her surgical incision healed.

Moreover, Lincoln National's decision to close Martindale's claim on December
28, 2009 was based on medical and vocational evidence in the administrative record
that was not available to the ALJ at the time of the decision.  The ALJ, for example, did
not have the benefit of Dr. Siegel's records from November 4, 2009 and December 28,
2009 demonstrating the healing process of Martindale's surgical wound or the March
2010 physical examinations noting Martindale's healed abdominal scar and lack of
abdominal pain.  The ALJ also did not have the benefit of the medical opinions of Dr.
Gottlieb from December 16, 2009 and Dr. Cooper from August 23, 2010 and October
18, 2010, concluding that Martindale is capable of sedentary work.  Finally, the ALJ did
not have the benefit of the Vocational Assessment of the Rehabilitation Counselor from
December 30, 2009 identifying occupations Martindale had the functional capacity and
skills to perform.  Under these circumstances, Lincoln National appropriately declined to
follow the Social Security decision.  See Barnes, 2008 WL 4298466, at *10 ("[T]he fact
that defendant reached a contrary conclusion on different evidence [than considered by
the SSA] does not show that its decision was arbitrary and capricious.").  See also Black
v. Long Term Disability Ins., 582 F.3d 738, 748 (7th Cir. 2009) (finding ERISA
administrator appropriately "discounted" the Social Security Administration's finding of
disability because the SSA did not review the information available to the administrator

22

in the administrative record).  Finally, Lincoln National explained its reasons for rejecting

the Social Security decision in its final denial letter.  (See LN 103).

## VI.  Conclusion

For the reasons stated above, having conducted a thorough review of the

administrative record, Lincoln National's decision denying Martindale's claim for LTD

benefits was neither arbitrary nor capricious.  Accordingly, Martindale's motion is

DENIED.  A judgment shall enter in favor of Lincoln National.

SO ORDERED.


 S/Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  September 8, 2011


I hereby certify that a copy of the foregoing document was mailed to the attorneys of
record on this date, September 8, 2011, by electronic and/or ordinary mail.


 S/Julie Owens_____
Case Manager, (313) 234-5160